

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

DEC - 3 2009

CLERK, U.S. DISTRICT COURT
By _____
                    Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

LEATHA SIMS,                    §
                               §
            Plaintiff,          §
                               §
VS.                             §    NO. 4:08-CV-513-A
                               §
KAREN GORDON MILLS,[1]          §
Administrator, United States    §
Small Business Administration,  §
                               §
            Defendant.          §

## MEMORANDUM OPINION
### and
### ORDER

Now pending before the court is the motion for summary judgment filed by defendant, Karen Gordon Mills, Administrator, United States Small Business Administration ("SBA"). Having considered the motion, the response of plaintiff, Leatha Sims, defendant's reply, the entire summary judgment record, and applicable legal authorities, the court concludes that the motion should be granted.

I.

### Plaintiff's Claims

In her original complaint, plaintiff alleges that defendant discharged her because of her race and gender and subjected her to a racially hostile working environment, in violation of Title

---

[1] Plaintiff's complaint originally named Sandy K. Baruah ("Baruah"), then Acting Administrator of the United States Small Business Administration ("SBA"), as defendant. On March 18, 2009, the style of the case was changed to reflect that Darryl Hairston ("Hairston") had succeeded Baruah to that post. On April 3, 2009, Karen Gordon Mills was confirmed by the Senate as Administrator of the SBA. Therefore, Mills is automatically substituted for Hairston as a party. See Fed. R. Civ. P. 25(d)(1).

1

VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII").

## II.

## Grounds of the Motion

Defendant seeks summary judgment on both of plaintiff's claims. First, defendant argues that plaintiff has not established a prima facie case of discriminatory discharge, and, alternatively, that plaintiff has failed to show that defendant's legitimate, nondiscriminatory reason for firing plaintiff was pretext. Second, defendant argues that plaintiff failed to exhaust her administrative remedies as to her hostile working environment claim. Defendant also argues that plaintiff's hostile working environment claim fails on the merits because some of the conduct on which plaintiff relies was not based on race; the conduct, even if based on race, was not sufficiently severe or pervasive to alter her conditions of employment; and plaintiff did not show that defendant knew or should have known of the conduct.

## III.

## Undisputed Facts

The following facts are undisputed in the summary judgment record:[2]

---

[2]The parties rely on testimony given under oath in an administrative hearing to establish a majority of the facts. At the hearing, plaintiff testified and was cross-examined about the altercation that led to her termination and the conditions of her working environment. Plaintiff's supervisors and other SBA officials involved in the decision to terminate plaintiff testified and were cross-examined about the decisional process that resulted in plaintiff's termination and their knowledge of the alleged racial harassment. Sworn testimony taken in an administrative proceeding has been considered to be probative

Plaintiff is a black female.  Pl.'s Compl. at 1, ¶ 1.  On February 27, 2006, she received a temporary appointment as a paralegal specialist at the Fort Worth, Texas, Loan Processing and Disbursement Center ("PDC") of the SBA, Office of Disaster Assistance.  Def.'s App. at 170.  The Office of Disaster Assistance is responsible for making loans to victims of declared disasters, such as Hurricane Katrina.  Id. at 177.  Employees at offices like the PDC evaluate loan applications, generate loan documents, and disburse funds to borrowers.  Id. at 178.

Plaintiff claims that she experienced several incidents of racial harassment during her employment at the PDC.  Specifically, one of plaintiff's white coworkers, Amy Jones ("Jones"), maintained what PDC employees called a "laugh board" in her cubicle, on which she posted poorly written letters from loan applicants.  Id. at 59-60.  Although the letters themselves did not indicate the race of their authors, on one occasion, Jones described the letters as being written by black applicants and told the plaintiff that black people could not spell.  Id. at 67-68.  On another occasion, plaintiff overheard one of her white, male coworkers, Bill Gardner ("Gardner"), ask another coworker, Anthony Moss ("Moss"), if "all black people brush their teeth with wood" in response to Moss's statement that Africans historically used roots to brush their teeth, rather than

---

summary judgment evidence.  See United States v. Chevron Oil Co., 583 F.2d 1357, 1360 (5th Cir. 1980), superseded by statute on other grounds, Pub. L. No. 95-576, § 1(b), 92 Stat. 2467; Steven v. Roscoe Turner Aeronautical Corp., 324 F.2d 157, 162 (7th Cir. 1963).

brushes.  Pl.'s App. at 18.  Additionally, because several members of plaintiff's work team were nonwhite minorities, members of her team referred to themselves as the "minority team."  Def.'s App. at 165.  Other employees who were not on plaintiff's work team also referred to her team as the "minority team."  Pl.'s App. at 12, 23.  Plaintiff never reported the laugh board, "minority team" nickname, or the comments made by Jones and Gardner to upper management or her team leader, Dean Miyazono ("Miyazono").[3]  Id. at 115.

On July 13, 2006, plaintiff was involved in an altercation with Gardner that ultimately led to her termination.  On that day, plaintiff arrived at work and signed on to her computer.  Id. at 47-48.  As she worked, plaintiff began talking to a coworker seated nearby, at which point, Gardner interrupted and asked if he could talk to someone who actually did work around the office.  Id. at 48.  Gardner then accused plaintiff of milking the clock and skipping work "because [her] ragety car broke down."  Id. at 49.  Plaintiff responded by suggesting that Gardner was jealous because he was doing the same work and making the same amount of money as the plaintiff, even though he was a lawyer and she had no education.  Id. at 62.  Gardner then repeatedly asked plaintiff how much money she made, despite her requests that he stop.  Id. at 49.  Gardner also asked plaintiff

---

[3]Plaintiff testified that Dean Miyazono ("Miyazono") instructed her team not to complain because they were the minority team.  Def..'s App. at 57.  Miyazono admits that he told his team not to complain, but disputes that this instruction was based on race or that he implied that employees should not complain about discrimination.  Id. at 164-65.

4

if she lived in the "hood" and if she was working the night shift to "move on up." Id. at 30. Gardner told plaintiff she should be at home because she was a mother. Id. at 49.

At some point, plaintiff called out to Miyazono to "come get this motherfucker," referring to Gardner. Id. at 50. Upon hearing plaintiff's exclamation, Miyazono, and Gardner's team leader, Kim Stoner ("Stoner"), came to intervene. Id. at 51, 80. When Stoner arrived on scene, she observed plaintiff leaning over her desk toward Gardner and yelling at him. Id. at 80. She observed that Gardner was shaking and that he said "I'm sorry. I was joking around. I need this job. I need this job." Id. at 80-82. One of plaintiff's coworkers suggested that she walk outside to calm down, after which plaintiff left the building, accompanied by four or five of her coworkers, for ten or fifteen minutes. Id. at 51-52, 66.

The next day, Horner was notified about the incident. Id. at 97-98. In her role as supervising attorney and facility manager for the PDC, Horner was responsible for making recommendations about the hiring and firing of employees. Id. at 178. Horner reviewed the written statements given by employees who had witnessed the incident and interviewed other witnesses. Id. at 100-03. She was told by all the witnesses with whom she spoke that plaintiff had shouted, used foul language, and acted aggressively toward Gardner and Miyazono. Id. at 104. Stoner told Horner that members of her team had requested to leave work

5

early because they were scared to be at work when plaintiff arrived. Id. at 109.

Horner called plaintiff to her office, where plaintiff gave her side of the story. Id. at 107-08. In addition to Horner, Human Resource Specialist, Deborah Carter, SBA Ombudsman, Mary Anne Gladden, and Attorney Advisor, Stacye Harness were in the room. Id. After giving her version of events, plaintiff left Horner's office, and, after discussing the matter, Horner, Carter, Gladden, and Harness decided to terminate plaintiff because of her conduct. Carter gave plaintiff a letter notifying her that she had been terminated for conduct unbecoming of a federal officer and for disrupting the workplace. Id. at 110.

Gardner was interviewed the following Monday by Deputy Area Counsel, Rob Goodson ("Goodson"), who had taken over the investigation of the incident. Id. at 113-14. Goodson issued a formal reprimand to Gardner for his role in the incident. Id. at 114. According to Horner, Gardner's conduct differed from that of the plaintiff because he did not use profanity, scream, or act aggressively, and that a reprimand was an appropriate sanction because his conduct did not rise to the same level of the plaintiff's conduct. Id. at 112, 114.

On September 14, 2006, plaintiff filed a formal complaint of discrimination with the SBA Office of Equal Employment Opportunity and Civil Rights Compliance ("EEO office"). In the complaint, plaintiff asserted,

> I believe I suffered discrimination based on race &
> color & sex, when on 7-14-06, a white male made racist
> and sexist comments to me [sic] I cursed for my lead to
> come get him [sic] I was terminated prior to an
> investigation but after the "investigation" he was not
> terminated as well.

Id. at 15.  When prompted by the form complaint to explain why
she thought defendant's actions were discriminatory, she wrote,
"They terminated me but not the guy (Bill Gardner) that made the
sexist & racist comments."  Id.

The EEO office sent plaintiff a Notice of Acceptance letter
defining the claim accepted for investigation as "[w]hether you
were subjected to discrimination on the basis of Race (African
American) and Sex (Female) when: On July 14, 2006, you were
terminated from your position as Paralegal Specialist, GS-7 in
the Ft. Worth Office of Disaster Assistance."  Id. at 17.
Plaintiff did not file objections to the scope of the issue
accepted for investigation and did not file any amendments to her
formal complaint.  Id.

On April 17, 2008, plaintiff and representatives from the
SBA appeared for a hearing before an administrative law judge.
Pl.'s App. at 2.  The judge described the issues to be heard as
"[w]hether Complainant was discriminated against and/or subjected
to a hostile work environment on the basis of her race, African
American and her sex, female, on July 14th, 2006, [when] she was
terminated from her position . . . ."  Id. at 4.  In the hearing,
plaintiff described her confrontation with Gardner and the events

leading to her termination.  Plaintiff also testified and was
cross-examined about the alleged incidents of racial harassment.

IV.

## Applicable Summary Judgment Principles

"The purpose of summary judgment is to pierce the pleadings
and assess the proof to determine if a genuine need for trial
exists."  Beeler v. Rounsavall, 328 F.3d 813, 816 (5th Cir.
2003).  Thus, summary judgment is proper when "the pleadings,
depositions, answers to interrogatories, and admissions on file
show that there is no genuine issue as to any material fact and
that the moving party is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 247 (1986).  An issue is "genuine" if a reasonable
jury could resolve the point in favor of the nonmoving party.
Anderson, 477 U.S. at 248.  A fact is "material" if it has the
power to affect the outcome of the case.  Id.

The onus is on the party moving for summary judgment to show
that there is no genuine issue of material fact.  Id. at 256.
Where, as here, the nonmoving party has the burden of proof, the
moving party can carry its summary judgment burden by pointing to
an absence of evidence establishing an essential element of the
nonmoving party's claim.  Celotex Corp. v. Catrett, 477 U.S. 317,
322-23 (1986).  Once this has been done, the nonmoving party must
"identify specific evidence in the record and . . . articulate
the 'precise manner' in which that evidence support[s] [its]
claim[s]."  Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994).

8

In deciding whether summary judgment is appropriate, the court must construe all facts on record and draw all reasonable inferences in the light most favorable to the nonmoving party, here, the plaintiff.  <u>First Colony Life Ins. Co. v. Sanford</u>, 555 F.3d 177, 180 (5th Cir. 2009).

V.

<u>Analysis</u>

A.   <u>Plaintiff's Discriminatory Discharge Claim</u>

Title VII makes it unlawful for an employer to discharge an employee because of that employee's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a).  Because plaintiff has not adduced direct evidence that she was discharged because of her race or gender, her discriminatory discharge claim is properly analyzed under the familiar burden-shifting framework enunciated by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-05 (1973).  <u>See also</u> <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252-56 (1981) (describing the burden-shifting framework).  The initial burden lies with the plaintiff to establish a <u>prima facie</u> case of discrimination. <u>Turner v. Baylor Richardson Med. Ctr.</u>, 476 F.3d 337, 345 (5th Cir. 2007).  Once the plaintiff establishes a <u>prima facie</u> case, a presumption of discrimination arises, and the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's discharge.  <u>Id.</u>  If the defendant carries this burden, the presumption of discrimination created by the plaintiff's <u>prima facie</u> case disappears, and the burden

9

reverts to the plaintiff to show that the defendant's proffered reason is merely pretext, and, moreover, that it is pretext for unlawful discrimination.   Id.

To establish a prima facie case of discriminatory discharge, plaintiff must demonstrate that (1) she is a member of a protected class, (2) she was qualified for her position, (3) she was discharged from her position, and (4) she was treated less favorably than other, similarly situated employees who were not members of her protected class.   Lee v. Kan. City S. Ry. Co., 574 F.3d 253, 259 (5th Cir. 2009).   Defendant does not dispute that plaintiff has established the first three elements of her prima facie case.   However, defendant contends, and the court agrees, that plaintiff has failed to adduce evidence establishing the fourth element, namely, that she was treated less favorably than other, similarly situated employees who were not in her protected classes.

As proof that she was treated less favorably than other, similarly situated employees who were not in her protected classes, plaintiff points out that, following the altercation between she and Gardner on July 13, 2006, defendant terminated her, but gave Gardner only a written reprimand.   Resp. at 12.   To prove that she and Gardner were similarly situated, plaintiff bears the burden of showing that the employment actions at issue were taken "under nearly identical circumstances."   Lee, 574 F.3d at 260.   Two employment actions will be deemed to have been taken under nearly identical circumstances when the employees being

10

compared had the same job responsibilities and had their
employment status determined by the same person.  Id.  Most
importantly, however, the plaintiff's conduct that drew the
adverse employment decision must have been "nearly identical" to
that of the proffered comparator from the perspective of the
employer.  Id.; see Perez v. Tex. Dep't of Criminal Justice, 395
F.3d 206, 210 (5th Cir. 2004).  "If the difference between the
plaintiff's conduct and that of those alleged to be similarly
situated accounts for the difference in treatment received from
the employer, the employees are not similarly situated . . . ."
Lee, 574 F.3d at 260 (quoting Wallace v. Methodist Hosp. Sys.,
271 F.3d 212, 221 (5th Cir. 2001)) (internal quotation marks
omitted).

     Based on the relevant criteria, a reasonable jury could not
find that plaintiff was discharged under nearly identical
circumstances as Gardner, who was given a reprimand.  To begin,
the decisions to terminate plaintiff and reprimand Gardner were
made by different people. Def.'s Reply App. at 2; Def.'s App. at
113, 116-17.  Moreover, although both plaintiff and Gardner
participated in the altercation, the terminating officials
perceived plaintiff's conduct to be more severe than Gardner's,
based on reports that plaintiff had used profanity, screamed, and
acted aggressively toward her coworkers, while Gardner had not.
Def.'s App. at 112, 114.  The differences between plaintiff's
conduct and that of Gardner accounted for the terminating
officials' belief that termination was appropriate discipline for

11

plaintiff and a reprimand was appropriate discipline for Gardner.
Id. at 112, 114.  Thus, plaintiff was not similarly situated to
Gardner, and, because she has not adduced evidence of other
employees receiving less severe treatment for comparable
behavior, she has failed to prove her prima facie case.  See
Smith v. Wal-Mart Stores (No. 471), 891 F.2d 1177, 1180 (5th Cir.
1990) (per curiam) (stating that two employees were not similarly
situated where one employee's conduct violated company policy and
the other employee's conduct did not); Green v. Armstrong Rubber
Co., 612 F.2d 967, 968 (5th Cir. 1980) (per curiam) (stating that
employees were not similarly situated where "the disparity in
punishment resulted from a difference in conduct . . . .").

        Even if the court were to conclude that plaintiff
established a prima facie case, she still would not prevail.
Defendant responded by asserting that it discharged plaintiff
because she used profanity, shouted, and acted aggressively
toward her coworkers, in violation of the SBA's "zero tolerance"
policy on workplace violence and disruptive behavior.  Def.'s Br.
at 22.  This reason was sufficient to discharge defendant's
burden to articulate a legitimate, nondiscriminatory reason for
firing the plaintiff.  See Anderson v. Douglas & Lomason Co., 26
F.3d 1277, 1301 (5th Cir. 1994) (holding that district court's
finding that a violation of company policy was a legitimate,
nondiscriminatory reason for termination was not clearly
erroneous).  Thus, the burden shifted back to plaintiff to show

                                12

that defendant's reason was merely pretext, and that it was pretext for discrimination.

In attempting to raise a fact issue as to pretext, plaintiff argues that defendant ignored its standard operating procedures in discharging her. Resp. at 14. Specifically, she claims that Appendix 2 to the SBA Standard Operating Procedures, titled "Offense and Disciplinary Action Guide," recommends that the appropriate disciplinary sanction for disorderly conduct should range from an official reprimand to a five-day suspension. Id. She argues that defendant's decision to ignore this range and to terminate her shows that defendant actually based its decision on her race and gender, not on the perceived severity of her conduct. Id.

The only record evidence the plaintiff proffers in support of this argument is an unauthenticated copy of what purports to be the Offense and Disciplinary Action Guide. Pl.'s App. at 32-36. Unauthenticated documents cannot create a genuine issue of fact on summary judgment. King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam). Even if the court could consider plaintiff's evidence, defendant presented uncontroverted testimony from Carter that the Offense and Disciplinary Action Guide was not in effect at the time plaintiff was terminated and that the recommendations therein were merely guidelines, which were not binding on any of the decisionmakers involved in plaintiff's termination. Def.'s Reply App. at 2, 4. In addition, the record shows that: defendant had a "zero tolerance"

13

policy on workplace violence and disruptive behavior in effect at the time of plaintiff's termination, this policy was communicated to the plaintiff in the new employee orientation pamphlet that she received upon receiving her appointment, and defendant applied this policy in deciding to terminate plaintiff.   Id. at 2, 6.   Accordingly, there is no basis to conclude that defendant's failure to apply the recommended range of punishment appearing in the Offense and Disciplinary Action Guide was evidence of pretext.

Finally, plaintiff also argues that defendant's legitimate, nondiscriminatory reason was pretext because defendant inconsistently applied its disciplinary policy.  Resp. at 13.   As described above, although plaintiff and Gardner both participated in the altercation on July 13, 2006, their conduct in that altercation was not identical.  Thus, that they received disparate degrees of discipline does not reflect an inconsistent application of the SBA's disciplinary policy. Plaintiff fails to show that defendant's legitimate nondiscriminatory reason was pretextual.[4]

---

[4]Defendant presented the uncontroverted testimony of Stacye Harness, attorney advisor for the PDC, and Michael Ledford, a human resource specialist in the SBA's Washington, D.C. office, that the PDC, specifically, and the SBA, organization-wide, have consistently terminated employees for shouting, verbally intimidating their coworkers, or using profanity, and, moreover, that males and caucasians have been among those terminated. Def.'s App. at 147-48, 157-60.

14

B.   Plaintiff's Hostile Working Environment Claim

    1.   Exhaustion of Administrative Remedies

Defendant contends that plaintiff is barred from bringing her claim for a hostile working environment because she failed to exhaust her administrative remedies as to that claim. Def.'s Br. at 16-18. The court has serious doubts that plaintiff has exhausted; however, the court need not decide the issue because, for the reasons described below, the court holds that plaintiff's hostile working environment claim fails on the merits.

    2.   The Merits

For plaintiff's hostile working environment claim to survive summary judgment, she must adduce evidence from which a reasonable jury could conclude that (1) she belongs to a protected group, (2) she was subjected to unwelcome harassment, (3) the harassment was based on her race, (4) the harassment affected a term, condition, or privilege of employment, and (5) defendant knew or should have known about the harassment and failed to take prompt remedial action. EEOC v. WC&M Enters., Inc., 496 F.3d 393, 399 (5th Cir. 2007). To affect a term, condition, or privilege of employment, harassment must be so severe or pervasive that it creates a working environment that is both subjectively and objectively hostile or abusive. Id. (citing Harris, 510 U.S. at 21-22). In other words, for the conduct identified by the plaintiff to be actionable, it must create not only an environment that she subjectively perceived as hostile or abusive (which defendant does not dispute), but also

15

one that a reasonable person would find hostile or abusive.  Id. (citing Harris, 510 U.S. at 21-22).  Whether conduct is sufficiently severe or pervasive to create an objectively hostile working environment depends on the totality of the circumstances, including the frequency and duration of the discriminatory conduct, whether the conduct is physically threatening or humiliating, and whether it interferes with the complaining employee's work performance.  Id. (citing Harris, 510 U.S. at 23).  "Title VII, however, is not a general civility code, and simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Lauderdale v. Tex. Dep't of Criminal Justice, 512 F.3d 157, 163 (5th Cir. 2007) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)); see EEOC v. Rogers, 454 F.2d 234, 238 (5th Cir. 1971) ("an employee's mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not violate Title VII).

Plaintiff argues that the following conduct created a hostile working environment: (1) Jones indicated to the plaintiff that the letters on the laugh board were written by black borrowers, (2) Jones told plaintiff that black people could not spell, (3) Gardner asked another coworker if "all black people brushed their teeth with sticks," (4) plaintiff's work team was referred to as the "minority team," (5) Miyazono told plaintiff and her team members not to complain because they were the

16

minority team, and (6) Gardner described her car as "ragety" and made comments suggesting that she was poor and uneducated.

Plaintiff has not adduced any evidence that Gardner's comments to her on July 13, 2006, were racially motivated. Although she may believe that Gardner was insinuating that she was poor and uneducated because she was black, her subjective beliefs to that effect, without more, cannot create a genuine issue of fact.  See <u>Watkins v. Tex. Dep't of Criminal Justice</u>, 269 F. App'x 457, 464 (5th Cir. 2008) (per curiam). Consequently, Gardner's comments to plaintiff on that date could not have contributed to a racially hostile working environment. <u>Id.</u>

The remaining conduct highlighted by the plaintiff was neither severe nor pervasive enough to alter the terms, conditions, or privileges of plaintiff's employment.  No reasonable jury could find that three unrelated comments, spread over plaintiff's four and one-half month employment, were sufficiently pervasive to cause plaintiff's work environment to be "permeated with discriminatory intimidation, ridicule, and insult."  Although the record indicates that the "minority team" moniker was used with some frequency, it was neither physically threatening nor humiliating.  There is no evidence that the nickname was used in a derogatory manner, and the fact that plaintiff and her teammates referred to themselves by that name strongly indicates that it was not, in fact, derogatory.  The comments made by Jones and Gardner, although racially

17

insensitive, were likewise neither physically threatening nor humiliating. Only Jones's comments were actually directed at the plaintiff, and they were only mildly offensive, "mere utterances" that the Fifth Circuit and Supreme Court have refused to find actionable. See Turner, 476 F.3d at 348 (holding that supervisor's comment to plaintiff that African-American students attended evening classes because they could not qualify for regular admission, along with other, isolated racially insensitive comments, did not rise to level of severe or pervasive harassment); McRay v. DPC Indus., Inc., 942 F. Supp. 288, 293 (E.D. Tex. 1996) (finding no hostile working environment where plaintiff's coworkers called him a "n---er," "black yankee," and "son"). Finally, although the parties dispute whether Miyazono's instructed his team members not to complain "because they were the minority team," this one statement is insufficient to create a fact issue as to a hostile environment. Thus, plaintiff has failed to adduce summary judgment evidence that the alleged conduct was sufficiently severe or pervasive to alter the terms, conditions, or privileges of her employment.

VI.

Order

For the reasons discussed above, the court concludes that defendant's motion for summary judgment should be granted. Therefore,

The court ORDERS that all claims and causes of action asserted by plaintiff, Leatha Sims, against defendant, Karen

Gordon Mills, Administrator, United States Small Business

Administration, be, and are hereby, dismissed with prejudice.

SIGNED December 3, 2009.

JOHN MCBRYDE
United States District Judge